13-2030-ag
Chen v. Holder

UNITED STATES COURT OF APPEALS

FOR THE SECOND CIRCUIT

August Term, 2014

(Argued: August 25, 2014     Decided: December 5, 2014)

Docket No. 13-2030-ag

HUO QIANG CHEN,

*Petitioner*,

—v.—

ERIC H. HOLDER, JR., UNITED STATES ATTORNEY GENERAL,

*Respondent*.

Before:

RAGGI, CHIN, AND CARNEY, *Circuit Judges*.

Petition for review of a Board of Immigration Appeals decision upholding denial of asylum and withholding of removal. The Board held that the imposition of a fine equal to approximately twenty times petitioner's annual income for resistance to a coercive population control program and ensuing

1

economic sanctions for failure to pay the fine after petitioner left China did not establish either past persecution or a well founded fear of future persecution under the circumstances of this case.

Petition for review DENIED in part as to past persecution determination and GRANTED in part as to feared future persecution determination. Agency decision as to asylum and withholding of removal VACATED and case REMANDED.

---

THEODORE N. COX, ESQ., New York, New York, *for Petitioner*.

YEDIDYA COHEN, Trial Attorney (Stuart F. Delery, Assistant Attorney General, David V. Bernal, Assistant Director, *on the brief*), Office of Immigration Litigation, Civil Division, United States Department of Justice, Washington, D.C., *for Respondent*.

---

REENA RAGGI, *Circuit Judge*:

Since his 2001 arrival in the United States more than thirteen years ago, Chinese national Huo Qiang Chen has been engaged in almost constant litigation to avoid removal from this country based on claimed past persecution and feared future persecution in China for resistance to that country's coercive population control program. In this latest round of proceedings, Chen petitions for review

of an April 25, 2013 decision of the Board of Immigration Appeals ("BIA"), which upheld a March 4, 2011 order by Immigration Judge ("IJ") Sandy K. Hom denying Chen's applications for asylum and withholding of removal and directing his removal from the United States. See In re Huo Qiang Chen, No. A077 353 815 (B.I.A. Apr. 25, 2013), aff'g No. A077 353 815 (Immig. Ct. N.Y.C. Mar. 4, 2011). Chen challenges the BIA's determination that, under the circumstances of this case, imposition of a fine equal to approximately twenty times Chen's annual income and, after Chen left China, a further sanction for failure to pay the fine, specifically, termination of his family's farming leasehold, did not establish either past persecution or a well founded fear of future persecution as those terms are used under the Immigration and Nationality Act ("INA"), Pub. L. No. 82-414, 66 Stat. 163 (1952) (codified as amended at 8 U.S.C. §§ 1101–1537).

For reasons discussed herein, we hold that while a severe fine can amount to economic persecution, an alien claiming to have suffered past persecution must show more than the imposition of such a fine; he must show that payment of the fine (or efforts to pay or collect it) actually deprived him of the basic necessities of life or reduced him to an impoverished existence. See In re T-Z-, 24

3

I. & N. Dec. 163, 171, 174 (B.I.A. 2007). At the same time, however, we clarify that an unpaid fine and sanctions imposed after an alien is already in the United States for nonpayment of a fine may support a well founded fear of future persecution if the alien were returned to his native country, particularly where the record indicates a likelihood that authorities would continue to demand payment of the fine and such payment would impoverish the alien or deprive him of the basic necessities of life.

Substantial evidence here supports the agency's finding that Chen failed to demonstrate that the imposition of a severe fine deprived him of the basic necessities of life or impoverished him before he left China. Accordingly, we deny review of the BIA's past persecution ruling. The agency erred, however, in concluding that no evidence existed of continuing demands for payment while Chen has been in the United States and in reaching other factual conclusions not supported by substantial evidence. We therefore grant review of the BIA's feared future persecution ruling. Accordingly, we vacate the BIA's order insofar as it denied Chen both asylum and withholding of removal based on such ruling, and we remand for further proceedings consistent with this opinion.

4

## I. Background

### A. Chen's Fines for Resisting China's Population Control Program

In China, Chen, who is almost illiterate, had worked as a farmer on a one-third acre plot of land leased to him (and to his father before him) by the government in a sharecropper arrangement. Chen realized approximately 1,000 Renminbi ("rmb") per year from farming, which he used to support himself, his wife, and their three children. Chen sporadically supplemented these earnings by doing odd jobs in his village, for which he was generally paid 15 rmb a day.[1]

By having three children, Chen and his wife had violated China's coercive population control program. As punishment, Chinese officials sterilized Chen's wife, and in April 1996, fined Chen 13,000 rmb. Chen paid 5,000 rmb of this fine, raising the money by selling his television and some rice and by borrowing 2,000 rmb from his sister. Chen testified that, in September 1996, government officials gave him ten days to pay the 8,000 rmb outstanding on the fine as well as an additional 10,000 rmb penalty. Thus, in 1996, Chen was fined a total of 23,000 rmb, with 18,000 rmb still owed.

---

[1] As of the date this case was submitted, the conversion rate between United States Dollars and Renminbi was 6.1540 rmb per dollar.

Ten days later, with the fine unpaid, government officials came to Chen's home in search of property that might be seized to satisfy the fine. Although they apparently found nothing worth taking, an argument ensued, which prompted Chen to flee his village to avoid retaliation.

For several years Chen hid in a neighboring village where he earned 1,500 rmb per year—more than he had earned farming—tending a community cow. Meanwhile, his wife continued to farm their assigned land.

B.     <u>Chen Illegally Enters the United States; Chinese Authorities Terminate His Farming Leasehold</u>

In 2001, Chen decided to leave China, paying a smuggler $50,000 to help him enter the United States. Chen's friends and relatives loaned him the money necessary to pay the smuggling fee. Since 2001, Chen has resided in New York, earning $9,000 to $10,000 a year working in the construction and restaurant industries. By 2010, he had repaid his debt to friends and relatives. Also, since 2003, Chen has been the sole support for his wife and children in China. In that year, as punishment for Chen's failure to pay the outstanding fine, Chinese officials terminated his family's right to farm its assigned plot of land. Chen's wife has not worked since that time. Chen asserts that government officials

nevertheless have continued coming to his family's home to seek payment of the fine.

### C. Chen's Efforts To Secure Relief from Removal

#### 1. Initial Agency Denial

Upon Chen's April 2001 arrival in the United States, immigration proceedings were initiated against him. From the outset, Chen conceded removability but requested asylum, withholding of removal, and relief under the United Nations Convention Against Torture ("CAT") based on feared persecution for resistance to China's population control program. He supported his claimed fear by reference to his wife's sterilization, the imposition of a 23,000 rmb fine, and—after 2003—the revocation of his family's farming rights for failure to pay the fine.

On May 13, 2002, after Chen's first hearing, the IJ found him not credible and denied him relief from removal. Chen appealed to the BIA, which, on October 8, 2003, rejected the IJ's adverse credibility determination, but nevertheless concluded that Chen had failed to establish eligibility for asylum, withholding of removal, or CAT relief. Chen unsuccessfully moved for the BIA to reopen and reconsider its ruling, whereupon he petitioned this court for review of the BIA's decision. On June 14, 2006, pursuant to a stipulation and

settlement by the parties, this court vacated the BIA's decision and remanded for further proceedings and reconsideration in light of Diallo v. INS, 232 F.3d 279, 288–90 (2d Cir. 2000) (holding that BIA may deny relief for lack of corroboration only if it (a) identifies particular pieces of missing, relevant documentation, and (b) shows that documentation at issue was reasonably available to alien), and Jin Shui Qiu v. Ashcroft, 329 F.3d 140, 153 (2d Cir. 2003) (same). Almost a year later, on May 30, 2007, the BIA remanded the case to the IJ.

### 2. Second Agency Denial

After further hearings, the IJ again denied Chen relief from removal on March 6, 2008. The IJ concluded that Chen (a) had not established entitlement to CAT relief, (b) was not eligible for asylum or withholding of removal based on his wife's sterilization, and (c) was not otherwise eligible for asylum or withholding of removal because he had not demonstrated his own resistance to the coercive population control policies. In a July 20, 2009 decision, the BIA identified error in the IJ's final conclusion. It found that Chen's payment to have his wife's intrauterine device removed and his purposeful failure to obtain birth permits for his second and third child manifested the necessary resistance. Accordingly, the BIA remanded the case to the IJ, with specific directions that

8

further evidence be taken as to Chen's financial circumstances to determine if he was entitled to relief based on economic persecution.

3.    <u>Third Agency Denial</u>

Chen provided further testimony before the IJ on October 26, 2010. On March 4, 2011, the IJ again ordered removal, concluding that Chen had waived his original request for CAT relief by not pursuing it further on remand and had not established either past economic persecution or a well founded fear of future economic persecution so as to warrant either asylum or withholding of removal. With respect to the latter conclusion, the IJ found that, although Chen had been fined a large amount, he had not demonstrated that the fine caused him substantial economic harm because (a) after Chen went into hiding, his family's income doubled because he was able to earn 1,500 rmb per year in a neighboring village while his wife continued to work their farm; (b) when Chinese authorities visited his home looking for valuables that might satisfy the fine, they seized nothing; (c) Chen had the demonstrated ability to borrow significant amounts of money—up to $50,000—from family and friends; (d) Chen had already left China when authorities terminated his farming leasehold in 2003; and (e) in the United States, Chen was able to earn enough money to repay his smuggling debt,

9

support his family in China, and accumulate savings of $1,716.75. As to feared future persecution, the IJ found that Chen's subjective fear was not objectively reasonable because there was no evidence (a) that government officials had come to his home or inquired about his whereabouts in the last ten years; or (b) that Chen would be unable to support himself upon return to China by farming, tending livestock in a neighboring village, or working in the construction or restaurant industries.

Chen appealed to the BIA and submitted a motion to reopen. On April 25, 2013, the BIA dismissed the appeal and denied reopening. Echoing the IJ, the BIA concluded that Chen had suffered no past economic persecution as a consequence of the large fine imposed on him because, when he failed to pay the fine, both he and his wife were able to continue working, and authorities did not confiscate their possessions or their home. The BIA explained that the 2003 termination of his farming leasehold did not constitute past persecution because it occurred only after Chen's 2001 departure from China. Instead, this confiscation was relevant to Chen's professed fear of future persecution. The BIA agreed with the IJ that Chen's fear of future persecution was not objectively reasonable because Chen's economic situation in the United States had changed

10

so as to allow him to pay the fine, and he could support himself in China by working in a neighboring village or doing odd jobs as he had in the past.

On May 22, 2013, Chen filed the current petition, which seeks review of the BIA's April 25, 2013 decision.

## II. **Discussion**

### A. Jurisdiction and Standards of Review

Federal courts have jurisdiction to review final orders of removal pursuant to 8 U.S.C. § 1252. Where, as here, the BIA affirms an IJ's removal order and "closely tracks the IJ's reasoning," we consider "both the IJ's and the BIA's opinions for the sake of completeness." Maldonado v. Holder, 763 F.3d 155, 158–59 (2d Cir. 2014) (internal quotation marks omitted). In doing so, we review the agency's factual findings only to determine whether they are "supported by substantial evidence," but we review its "conclusions of law de novo." Niang v. Holder, 762 F.3d 251, 253 (2d Cir. 2014).

Under the substantial evidence standard, the agency's factual findings are "conclusive unless any reasonable adjudicator would be compelled to conclude to the contrary." 8 U.S.C. § 1252(b)(4)(B). While this standard is highly deferential, it does not admit "misstatement of the facts in the record []or bald

11

speculation or caprice." <u>Shu Wen Sun v. BIA</u>, 510 F.3d 377, 380 (2d Cir. 2007) (internal quotation marks omitted).

As for legal conclusions, where the BIA has issued a precedential opinion, our <u>de novo</u> review is limited to determining whether the BIA's legal interpretations satisfy the requirements for deference under <u>Chevron, U.S.A. v. Natural Resources Defense Council</u>, 467 U.S. 837 (1984). <u>See</u> <u>Baraket v. Holder</u>, 632 F.3d 56, 58 (2d Cir. 2011). Non-precedential opinions, such as the BIA opinion here, cannot claim <u>Chevron</u> deference. <u>See</u> <u>Mei Juan Zheng v. Holder</u>, 672 F.3d 178, 184 (2d Cir. 2012). Our court has not yet decided whether non-precedential BIA opinions are entitled to deference pursuant to <u>Skidmore v. Swift & Co.</u>, 323 U.S. 134 (1944), which affords agency interpretations "respect according to [their] persuasiveness," <u>Sai Kwan Wong v. Doar</u>, 571 F.3d 247, 260 (2d Cir. 2009) (internal quotation marks omitted). <u>See</u> <u>Dawkins v. Holder</u>, 762 F.3d 247, 249 (2d Cir. 2014) (observing that question of <u>Skidmore</u> deference to unpublished BIA decisions remains open). We need not conclusively answer the question here because the BIA's legal reasoning is infected by factfinding not supported by substantial evidence and, therefore, would not warrant <u>Skidmore</u> deference even if it applied. <u>See</u> <u>Gonzales v. Oregon</u>, 546 U.S. 243, 269 (2006)

12

(stating that "under Skidmore," courts follow agency's interpretation only to "extent it is persuasive").

As relevant here, whether certain events will or might occur in the future is a question of fact. See Hui Lin Huang v. Holder, 677 F.3d 130, 134 (2d Cir. 2012). On the other hand, whether certain events, if they occurred, would constitute persecution as defined by the INA is a question of law. See id. at 136. Further, whether a given likelihood of persecution satisfies the requirements for asylum or withholding of removal is a question of law. See id. at 135.

B.    The Statutory Scheme

1.    Asylum

Asylum is a form of discretionary relief that allows an otherwise removable alien to remain and work in the United States. See 8 U.S.C. § 1158(b)(1)(A), (c)(1). To qualify for asylum, an alien must demonstrate that he is a "refugee," id. § 1158(b)(1), meaning that he is unable or unwilling to return to, and unable or unwilling to avail himself of the protection of, his home country because of past persecution or a well founded fear of future persecution on account of race, religion, nationality, membership in a particular social group, or political opinion, see id. § 1101(a)(42)(A); see also 8 C.F.R. § 1208.13(b); Mei Fun Wong v. Holder, 633 F.3d 64, 68 (2d Cir. 2011). Persecution on account of

13

"resistance to a coercive population control program" is statutorily deemed to be "persecut[ion] on account of political opinion."  8 U.S.C. § 1101(a)(42); see generally Mei Fun Wong v. Holder, 633 F.3d at 68–70.  Meanwhile, a well founded fear of future persecution requires a subjective fear that is objectively reasonable.  See Jian Xing Huang v. INS, 421 F.3d 125, 128 (2d Cir. 2005).  Supreme Court precedent instructs that a fear of future persecution may be well founded even where the probability of the feared harm is less than 50%.  See INS v. Cardoza-Fonseca, 480 U.S. 421, 431 (1987) ("One can certainly have a well-founded fear of an event happening when there is less than a 50% chance of the occurrence taking place."); accord Guan Shan Liao v. U.S. Dep't of Justice, 293 F.3d 61, 69 (2d Cir. 2002).

      2.    Withholding of Removal

Withholding of removal is a form of mandatory relief that prevents an otherwise removable alien from being removed to a country where "the alien's life or freedom would be threatened in that country because of the alien's race, religion, nationality, membership in a particular social group, or political opinion."  8 U.S.C. § 1231(b)(3).  Threats to life or freedom comprise a narrower category than persecution.  See Ivanishvili v. U.S. Dep't of Justice, 433 F.3d 332, 339, 341 (2d Cir. 2006) (noting that while "concept of persecution inheres in the

14

analysis of both asylum and withholding of removal," "persecution includes more than threats to life or freedom" (internal quotation marks omitted)). Moreover, showing that life or freedom <u>would</u> be threatened is a higher burden than establishing a well founded fear of such harm; specifically, it requires evidence that life or freedom threatening harm "'is more likely than not.'" <u>Vanegas-Ramirez v. Holder</u>, 768 F.3d 226, 237 (2d Cir. 2014) (quoting <u>INS v. Stevic</u>, 467 U.S. 407, 424 (1984)).

Because the standard for withholding of removal is thus more demanding than that for asylum, it necessarily follows that an alien who cannot demonstrate eligibility for asylum also cannot demonstrate entitlement to withholding of removal. <u>See</u> <u>id.</u>

C.      <u>Economic Persecution</u>

Courts have long recognized that certain economic sanctions can rise to the level of persecution. <u>See, e.g.,</u> <u>Dunat v. Hurney</u>, 297 F.2d 744, 746 (3d Cir. 1961) (interpreting former version of withholding-of-removal provision requiring "physical persecution" and holding that economic persecution can suffice because "[t]he denial of an opportunity to earn a livelihood in a country such as the one involved here is the equivalent of a sentence to death by means of slow starvation and none the less final because it is gradual"); <u>accord</u> <u>Diminich v.</u>

Esperdy, 299 F.2d 244, 247 (2d Cir. 1961) (noting "full[] agree[ment]" with Dunat's holding on economic persecution). Despite that long recognition, a consistent standard for identifying when economic injury rises to the level of persecution has proved elusive. See Mirzoyan v. Gonzales, 457 F.3d 217, 221–23 (2d Cir. 2006) (describing history of conflicting standards). In response to a request by this court for clarification of the standard governing economic persecution claims, see id. at 223, the BIA attempted to articulate a definitive standard in In re T-Z-, 24 I. & N. Dec. 163. We have not yet decided whether the In re T-Z- standard is entitled to Chevron deference. See Xiu Fen Xia v. Mukasey, 510 F.3d 162, 165 (2d Cir. 2007). Neither party here argues that the standard is not entitled to such deference; instead, each insists that In re T-Z- compels a judgment in its favor. We therefore deem any argument regarding the applicability of the In re T-Z- standard to be forfeited, and we apply that standard to Chen's claim of economic persecution.

In re T-Z- instructs that an economic sanction constitutes persecution if it (1) "'depriv[es] [the victim] of liberty, food, housing, employment or other essentials of life,'" or (2) deliberately imposes a "'severe economic disadvantage.'" 24 I. & N. Dec. at 171 (emphasis omitted) (quoting H.R. Rep. No.

16

95-1452, at 5 (1978), reprinted in 1978 U.S.C.C.A.N. 4700, 4704). The first prong of this standard is intended to reference "deliberate deprivation of basic necessities such that life or freedom is threatened." Id. at 171. The second prong references sanctions that, while not actually threatening life or freedom, nonetheless "reduce an applicant to an impoverished existence." Id. at 174.

Economic sanctions that might manifest persecution include "particularly onerous fine[s]," "large-scale confiscation[s] of property," and "sweeping limitation[s] of opportunities to continue to work in an established profession or business." Id. There is, however, no fixed threshold for the economic harms that will manifest persecution. Instead, whether a given economic sanction constitutes persecution turns on its "impact" on the victim. Id.; accord In re J-H-S-, 24 I. & N. Dec. 196, 200–01 (B.I.A. 2007), petition for review denied sub nom. Jian Hui Shao v. Mukasey, 546 F.3d 138 (2d Cir. 2008). Thus, a sanction that impoverishes a poor victim would constitute persecution, while the same sanction imposed on a wealthier individual without such effect would not. See In re T-Z-, 24 I. & N. Dec. at 173 n.10, 174–75; see also Guan Shan Liao v. U.S. Dep't of Justice, 293 F.3d at 70 (holding that whether fine constitutes persecution turns on victim's financial circumstances and fine's effect). In sum, an economic

sanction is persecution only if its impact is an "infliction of suffering or harm" that on its own would be sufficient to constitute persecution. <u>Mei Fun Wong v. Holder</u>, 633 F.3d at 72 (internal quotation marks omitted).

### D. <u>Chen's Asylum Claim</u>

In denying Chen asylum, the agency determined that he had failed to demonstrate economic harms manifesting either past persecution or a well founded fear of future persecution. We identify no error in the past persecution determination, but we vacate the agency's rejection of Chen's claimed fear of future persecution and remand for further proceedings on that issue.

#### 1. <u>Past Persecution</u>

Chen argues that the agency erred in rejecting his past persecution claim because the imposition of an 18,000 (or 23,000) rmb fine on a man with an income of only 1,000 to 1,500 rmb per year must, as a matter of law, be found to constitute economic persecution without regard to whether the fine was paid. That argument improperly conflates the issue of when an economic sanction is severe enough to have persecutive potential with when such a sanction in fact effects persecution.

A total 23,000 rmb fine, more than twenty times Chen's annual income, was certainly "extraordinarily severe" and "particularly onerous"—<u>i.e.</u>, the kind

18

of economic sanction that <u>In re T-Z-</u> recognized could amount to persecution. I. & N. Dec. at 171, 174. But <u>In re T-Z-</u> does not state that the mere imposition of a severe or onerous fine necessarily effects persecution. Rather, <u>In re T-Z-</u> explains that an economic sanction constitutes persecution when it actually "depriv[es] [the alien] of basic necessities such that life or freedom is threatened," <u>id.</u> at 171, or reduces the alien "to an impoverished existence," <u>id.</u> at 174. The imposition of a severe or onerous fine does not, by itself, have these persecutive effects. A severe fine may, after all, go unpaid. The government might not attempt to collect the fine, or its attempts might not deprive the alien of life's necessities or render him impoverished. Thus, while imposition of a severe or onerous fine may have the potential to impoverish or to deprive a person of life's necessities in the <u>future</u>, a person has not suffered <u>past</u> persecution until payment or collection efforts actually have such persecutive effects. <u>See id.</u> at 168 (observing that immigration law requires that there be "actual harm . . . amounting to persecutory harm"); <u>see also</u> <u>Mei Fun Wong v. Holder</u>, 633 F.3d at 72 (collecting cases describing persecution as "<u>infliction</u> of suffering or harm" on proscribed ground (emphasis added) (internal quotation marks omitted)).[2] Rather,

---

[2] Efforts to collect an onerous fine may result in persecution that goes beyond the

19

imposition of a severe or onerous fine, on its own, can support only a well founded fear of future persecution.

This conclusion finds support in our precedent, as well as that of our sister circuits, holding that threats of persecution, no matter how credible, do not demonstrate past persecution. See Gui Ci Pan v. U.S. Att'y Gen., 449 F.3d 408, 412–13 (2d Cir. 2006); see also Zhen Hua Li v. Att'y Gen. of U.S., 400 F.3d 157, 164–65 (3d Cir. 2005) (cited approvingly in Gui Ci Pan) (stating that even "sinister and credible" threats, including "death threats," would not qualify as past persecution unless fulfilled or "highly imminent"); Lim v. INS, 224 F.3d 929, 932–33, 936 (9th Cir. 2000) (cited approvingly in Gui Ci Pan) (identifying no past persecution despite highly credible death threats). That is true even where, as here, the threat implicit in an onerous fine—that collection will render one impoverished or without the necessities of life—leads the alien to flee his own village and hide in a neighboring one to avoid suffering these effects. See generally Gui Ci Pan v. U.S. Att'y Gen., 449 F.3d at 412 (stating that where

---

economic, as the Seventh Circuit demonstrated through a dramatic hypothetical. See Xiu Zhen Lin v. Mukasey, 532 F.3d 596, 598 (7th Cir. 2008) (observing that persecution would have occurred where "government tells a religious heretic we are going to fine you $1 million for your heresy and if you cannot pay we are going to burn you at the stake, and the heretic cannot pay and therefore is executed"). That is not this case.

20

petitioner's girlfriend was able to avoid forced abortion by couple's going into hiding, petitioner could not claim past persecution from threat of abortion); Guan Shan Liao v. U.S. Dep't of Justice, 293 F.3d at 70 (holding that petitioner who fled village after imposition of economic fine and threat of detention had not demonstrated past persecution).[3] Instead, threats may be used to establish only a well founded fear of future persecution. See Guan Shan Liao v. U.S. Dep't of Justice, 293 F.3d at 70; see also Zhen Hua Li v. Att'y Gen. of U.S., 400 F.3d at 165 n.3 ("[U]nfulfilled threats are generally within that category of conduct indicative of a danger of future persecution." (internal quotation marks omitted)); Lim v. INS, 224 F.3d at 936 ("[Threats are] precisely that—threats of future harm.").

Chen cites no case in which a court has found past economic persecution on the basis of an unpaid fine. Indeed, in the one case he cites where a court's

---

[3] In Miljkovic v. Ashcroft, 376 F.3d 754 (7th Cir. 2004), the Seventh Circuit held that an alien had satisfactorily demonstrated persecution where he fled Serbia after receiving a draft notice that, based on his ethnicity, targeted him for hazardous military duty, possibly violative of international law. "Being driven out of one's country is another crossing of the line that separates mere discrimination from persecution." Id. at 756. Chen does not cite Miljkovic, nor would that case help him given that Chen's initial flight involved a move to a neighboring village, not a change of country. Nor does the record indicate any change in circumstances that, after years in that village, drove Chen out of China.

21

finding of past persecution rested, in part, on a fine, the alien had been forced to pay the fine before fleeing China. See Zhen Hua Li v. Att'y Gen. of U.S., 400 F.3d at 169 (finding economic persecution based partly on fine); id. at 174 (Sloviter, J., dissenting) (noting that alien had paid fine while in China). Moreover, when our court has considered whether a particular fine constituted past persecution, we have required the alien to demonstrate that payment of the fine actually "constituted a substantial disadvantage to him." Guan Shan Liao v. U.S. Dep't of Justice, 293 F.3d at 70 (noting that alien claimed to have paid fine).

In short, because economic persecution occurs only when a person is deprived of the necessities of life or rendered impoverished, and because Chen failed to show that the fine imposed on him ever had such effects before he left China, he necessarily fails to demonstrate that the BIA erred as a matter of law in rejecting his claim of past persecution.

The 2003 termination of Chen's farming leasehold warrants no different conclusion, because past persecution references persecution that the alien has experienced in his native country before departing from it. See 8 C.F.R. § 1208.13(b)(1) (requiring alien claiming past persecution to have been persecuted "in the past in the applicant's country of nationality or, if stateless, in

22

his or her country of last habitual residence"). Chen left China in 2001. Thus, by the time his leasehold was terminated, he had been in the United States for almost two years. Moreover, he was working in this country, earning enough to support himself, repay loans, accumulate modest savings, and—after termination of the leasehold—support his wife and children in China. Whatever economic hardships the leasehold termination may have visited upon his wife and children, Chen cannot show that the sanction ever resulted in his own economic persecution. Instead, the loss of Chen's leasehold is a factor properly considered in assessing whether he has a well founded fear of future economic persecution if returned to China.

Accordingly, we conclude that there is no merit to Chen's argument that, as a matter of law, the record compels a finding that he suffered past economic persecution. To the contrary, the agency reasonably concluded that the record does not admit such a finding.

### 2. Well Founded Fear of Future Persecution

The BIA and IJ concluded that despite an outstanding 18,000 rmb fine and the loss of his farming leasehold, Chen did not have a well founded fear of future economic persecution upon return to China because (a) he had not claimed that Chinese officials made any attempt to collect the fine after 2003; and (b) even if

payment were demanded, Chen could (1) make arrangements for installment payments, (2) borrow money from friends and relatives, (3) earn money working in a neighboring village, as he had before fleeing China, and (4) use his savings of $1,716.75. A number of these findings rest on misstatements of fact or are not supported by substantial evidence in the record.

First, as the government concedes, Chen testified that Chinese officials have frequently come to his family's home over the past decade looking for money to satisfy his outstanding fine. See J.A. 133. Thus, the agency finding that Chen failed to claim continued collection efforts in the past decade—the basis for its conclusion that Chen might not face continued persecutive fine obligations upon return to China—is not supported by substantial evidence.

Second, the finding that Chen could likely arrange for reasonable installment payments of his outstanding 18,000 rmb fine upon return to China finds no support in the record. To the contrary, the record shows that in September 1996, within five months of Chen's initial payment of 5,000 rmb on the original 13,000 rmb fine, Chinese officials came to Chen's home and told him he had ten days to pay the outstanding 8,000 rmb owed plus an additional 10,000 rmb delinquency penalty. In short, far from being permitted to make reasonable

24

installment payments on his fine, Chen was under orders to pay a total of 23,000 rmb, more than twenty times his annual income, within a period of less than six months. The agency's reasonable-installment conclusion appears to derive from the IJ's reference to September <u>1998</u> as the time when the additional 10,000 rmb penalty was imposed and full payment demanded. <u>See</u> J.A. 93, 96, 97. The record, however, shows that Chen consistently maintained that the demand for full payment and the imposition of the additional penalty occurred in September <u>1996</u>. <u>See</u> J.A. 109, 617, 970, 1214. Indeed, in previous decisions, the IJ found and the BIA acknowledged that the additional fine was imposed in 1996. <u>See</u> J.A. 263 n.3, 289–90. Thus, the IJ's finding that the additional fine and full payment demand occurred in 1998—the basis for his determination that Chen had been given two years to pay the fine and might, therefore, reasonably expect to negotiate installment payments upon return to China—is not supported by substantial evidence.

Third, the agency found that because Chen had borrowed and repaid substantial amounts from friends and relatives in the past—2,000 rmb from his sister to make his initial fine payment and $50,000 from friends and relatives to cover the smuggling fee that got Chen to the United States—he could likely do so

again to pay any fine demanded upon return to China. While the record can support a finding that Chen's sister might again lend him money to pay his fine, the same conclusion does not necessarily obtain with respect to further loans from others. In Xue Yun Zhang v. Gonzales, 408 F.3d 1239 (9th Cir. 2005), the Ninth Circuit reviewed a similar agency finding that an alien's family could help her pay a fine in China because it had paid for her to come to the United States. See id. at 1247–48. The court concluded that the finding was not supported by substantial evidence insomuch as the alien had explained that family members had paid for her to come to the United States because they knew she could earn enough here to reimburse them, but that they would not lend her money to repay a fine in China because there was no prospect that she would ever earn enough in that country to make repayment. See id. at 1248. Although Chen gave similar testimony here, see J.A. 121, neither the IJ nor the BIA made any attempt to distinguish this case from Xue Yun Zhang or to indicate what, if any, reasoning might support an agency decision not to apply that holding to cases outside the Ninth Circuit. In the absence of any such discussion—which we do not foreclose on remand—we are inclined to agree with the Ninth Circuit that a loan of money to help an alien travel to the United States, where he can earn

enough to repay his lenders, is not substantial evidence to support a conclusion that the same persons can or would lend the alien money to help pay a fine in China where there is little prospect of repayment.

Chen does not dispute, and we identify no error in, the agency's other findings, i.e., that he could use his savings to pay part of his outstanding fine, and that, despite loss of his farming leasehold, he could find some gainful employment in China, whether in his own village or neighboring ones. Nevertheless, these findings are not sufficient for us to conclude with confidence that, with the other factual errors corrected on remand, the agency would still conclude that Chen does not have an objectively reasonable fear of future economic persecution if returned to China. See Kone v. Holder, 596 F.3d 141, 143 (2d Cir. 2010).

Assuming that Chen could use both his savings of $1,716.75 (10,565 rmb) and another 2,000 rmb borrowed from his sister to pay the outstanding 18,000 rmb fine, he would still fall 5,435 rmb short of the full amount due. Whatever employment Chen might be able to find in China, there is no evidence to support a conclusion that a man who never earned more than 1,500 rmb per year in that country and who no longer had a farming leasehold could quickly earn more

than three times that amount so as to pay the more than 5,000 rmb due after depleting his savings and borrowing from his sister, much less that he could do so without becoming impoverished or deprived of the necessities of life—i.e., without suffering economic persecution.

Indeed, the probability of such future persecution is only reinforced by evidence that Chinese authorities previously demanded that Chen pay his fine in full and responded to his failure to do so with additional monetary sanctions and, eventually, the termination of Chen's farming leasehold—which termination, but for Chen's United States earnings, would have left his family impoverished. Thus, even if termination of the farming leasehold while Chen was in the United States did not subject him to economic persecution at that time, the action is relevant to whether Chen might reasonably fear economic persecution upon return to China if he could not make full payment on the outstanding fine. See generally Fei Mei Cheng v. Att'y Gen. of U.S., 623 F.3d 175, 194–95 & n.14 (3d Cir. 2010) (concluding that confiscation of family farm and truck constituted economic persecution where "family depended on the farm to make a living," even though alien "was able to 'get by' with a job she located in another city" (internal quotation marks omitted)); Zhen Hua Li v. Att'y Gen. of

U.S., 400 F.3d at 169 (concluding that fine equal to one-and-one-half years' salary was "extremely onerous").

Accordingly, because substantial evidence in the present record does not support some of the critical findings of fact informing the agency's conclusion that Chen's subjective fear of future economic persecution in China is not objectively reasonable, and because we cannot conclude with confidence that the agency will reach that same conclusion with the record corrected on remand, we vacate so much of its order as denies Chen relief based on a fear of future persecution. We neither require nor foreclose the agency on remand from expanding the record on factual matters relevant to the feared future persecution claim, such as whether an 18,000 rmb fine against Chen remains outstanding in China; whether Chinese authorities have a continuing interest in collecting such a fine; and whether Chen has the ability to pay the full fine amount demanded (whether from savings, loans, or earnings) without becoming impoverished or deprived of life's necessities, in short, without economic persecution. It is not our task to engage in such factfinding, see Xiao Ji Chen v. U.S. Dep't of Justice, 471 F.3d 315, 334–35 (2d Cir. 2006), but only to ensure that the agency's findings are supported by the requisite substantial evidence. If, however, the IJ finds a

reasonable probability that an onerous fine remains outstanding against Chen, and that a reasonable person would fear that he would be forced to pay that fine upon return to China although he lacked means sufficient to do so without becoming impoverished or deprived of life's necessities, then the agency should find Chen to have established the well founded fear of future economic persecution necessary to render him eligible for asylum and exercise its discretion accordingly.

E.    Chen's Withholding of Removal Claim

The agency denied Chen withholding of removal solely on the ground that he had not met the lower burden for asylum.  Because we vacate the agency's order denying asylum, we also vacate its denial of withholding of removal and remand for further consideration of whether the corrected (or expanded) factual record supports this non-discretionary relief.

III.   **Conclusion**

To summarize, we conclude as follows:

1. To demonstrate past economic persecution, an alien must do more than demonstrate that an extraordinarily severe or particularly onerous fine has been imposed on him for engaging in protected conduct.  He must show that payment of the fine or efforts to pay or collect such a fine have had the actual effect of

depriving him of life's necessities or rendering him impoverished before he entered the United States.

2.  Imposition of an extraordinarily severe or particularly onerous fine, even without payment, can support an alien's well founded fear of future economic persecution if returned to his native country, particularly where there is record evidence of authorities' continuing interest in collecting the fine and the alien's inability to make payment without being deprived of life's necessities or rendered impoverished.

3.  We identify no error of law or fact in the agency's determination that petitioner here failed to demonstrate past economic persecution.  We do, however, identify error in the agency's determination that petitioner failed to demonstrate a well founded fear of future economic persecution because a number of factual findings informing that conclusion are not supported by substantial evidence.

Accordingly, the petition for review is DENIED in part as it pertains to claimed past persecution and GRANTED in part as it pertains to feared future persecution.  The order of removal is VACATED insofar as it denied petitioner both asylum and withholding of removal based on feared future persecution,

31

and the case is REMANDED for further proceedings on that ground consistent with this opinion.